# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
### PHILADELPHIA, PA

United States ex rel. the minor child
    Keyla Eulalia RUIZ GUAJARDO,
    Lawrence COX, and
    Nancy RODRIGUEZ COX,
    Conservator of the minor child,

                Petitioners

      v.

                                        Case no.

Kathleen Sebelius Secretary of Health and Human Services

Eskinder Negash, Director of the Office of
Refugee Resettlement (ORR),

Tricia Swartz, Associate Deputy Director for
Children's Services of the Office of
Refugee Resettlement (ORR)

Jeh Johnson, Secretary of the Department of
Homeland Security;

Thomas Decker, Field Office Director,
US ICE Philadelphia, Pennsylvania

Noel Sanchez Jr., , Director of Field Operations,
Customs and Border Patrol Laredo, Texas Field Office

Lutheran Children and Family Services, Philadelphia

Hebrew Immigration Assistance Society, Philadelphia

Support Center for Child Advocates of Philadelphia

Young Center for Immigrant Children's Rights in Chicago

                Respondents.

## PETITION FOR WRIT OF HABEAS CORPUS
## AND COMPLAINT FOR WRIT OF MANDAMUS
## AND DECLARATORY JUDGMENT

"In all debates, let truth be thy aim, not victory, or an unjust interest."

William Penn

## INTRODUCTION

This Petition and Complaint seeks a Writ of Habeas Corpus and Writ of Mandamus and/or a Declaratory Judgment: 1) to review the actions and inactions of the U.S. Government, specifically the Department of Health and Human Services, its designees and the Department of Homeland Security from June 7, 2011 to present relating to the seizure, detention and other actions taken towards the minor child Keyla Eulalia RUIZ GUAJARDO in violation of Federal and state law. This Petition and Complaint is being submitted on Keyla's behalf by Mr. Lawrence Cox and Ms. Nancy Rodriguez Cox (hereinafter Petitioners) pursuant to an order of Conservatorship (Guardianship) issued by the Texas District Court, 73rd District on April 13, 2012 that charges them with the responsibility for her proper care and protection. Through the U.S. government agencies' refusal to engage in even the most basic of communications regarding Keyla's welfare and their placement of Keyla in a secret, undisclosed location, the Defendants are unlawfully detaining Keyla and preventing the Petitioners from executing their legal and moral obligations. They have also unlawfully denied Petitioners' application for family reunification with Keyla, issuing a decision that contained no reasoning. Their failure to provide even the simplest basis for the denial and continuing refusal to provide such reasoning violates the Administrative Procedures Act (APA) (5 U.S.C. §701 et. seq.) and is preventing the Petitioners from fulfilling their obligations to Keyla. Those obligations began when they promised Keyla's great-grandmother in Mexico to provide for her and have continued through to the present day pursuant to the Texas state court order and that personal promise.

Petitioners respectfully request this Court to exercise jurisdiction over this matter and direct the relief outlined below.  In support of this Petition and Complaint, it is averred as follows:

## PARTIES

1. Petitioner, minor child Keyla Eulalia Ruiz Guajardo is being held by the defendants in the Philadelphia, Pennsylvania area.  Keyla was born August 22, 1999 in Matamoros, Mexico.  Her mother, Nereyda Concepcion Ruiz Guajardo was just 12 years old at the time of Keyla's birth.  Keyla is the child of a gang rape of Nereyda and her father is unknown.  Keyla is a special needs child who has been diagnosed with partial and complex partial epilepsy, cerebral palsy, static encephalopathy, pseudo-bulbar palsy, and microcephaly.

2. Petitioner, Lawrence Cox is a U.S. citizen.  On April 13, 2012 he and his wife, Dr. Nancy Rodriguez Cox were granted conservatorship over the minor child, Keyla Eulalia Ruiz Guajardo in Texas.

3. Petitioner Dr. Nancy Rodriguez Cox is a U.S. Permanent Resident.  On April 13, 2012 she and her husband Lawrence Cox were granted conservatorship over the minor child, Keyla Eulalia Ruiz Guajardo in Texas.

4. Defendants/Respondents are officers of the United States or the designees of those officers, respectively:

   a. Kathleen Sebelius Secretary of Health and Human Services;

   b. Eskinder Negash, Director of the Office of Refugee Resettlement (ORR);

    c.   Tricia Swartz, Associate Deputy Director for Children's Services of the Office of Refugee Resettlement (ORR);

    d.   Jeh Johnson, Secretary of the Department of Homeland Security;

    e.   Thomas Decker, Field Office Director, US ICE Philadelphia, Pennsylvania;

    f.   Noel Sanchez Jr.,  Director of Field Operations, Customs and Border Patrol Laredo, Texas;

    g.   Lutheran Children and Family Services, Philadelphia, Pennsylvania;

    h.   Hebrew Immigration Assistance Society (HIAS), Philadelphia, Pennsylvania;

    i.   Support Center for Child Advocates of Philadelphia, Pennsylvania.

    j.   Young Center for Immigrant Children's Rights in Chicago, Illinois.

The named U.S. Government officials/officers are sued in their official capacities only. The named non-profit organizations are sued in their capacity as the designees of the Government, specifically the ORR.  These agencies and their designees are empowered and entrusted with the proper enforcement of the Immigration laws that are the subject of this Complaint.  All Defendants have, at one time or another, been involved in actions to establish or maintain U.S. government custody over the minor child, Keyla Eulalia Ruiz Guajardo.

## JURISDICTION

3.    This Court has jurisdiction over Petitioner's petition under U.S. Const. Art. I, sec. 9 and 28 U.S.C. §2241(c)(3), because Keyla is being held "...in custody in violation of the Constitution or laws or treaties of the United States." See *Zubeda v. Elwood*, 265 F. Supp 2d. 509 (3d Cir. 2003); see also *Perez v. Elwood*, 294 F.3d 552 (3d Cir. 2002) and *Ngo v.*

*INS*, 192 F.3d 390, 400 (3rd Cir. 1999) (Reversing decision to continue detention for failure to follow applicable procedures and setting forth Appendix of Court providing for Interim Procedures for agency to follow).  The Petitioner requests this Court to assume jurisdiction **over the petitioner's person** through traditional Habeas Corpus, to determine custody.  In the alternative, the Court should assume jurisdiction pursuant to Habeas Corpus to review the ongoing custody determinations of the government, which are in violation of its own laws and regulations.

4.     This complaint asserts the unlawfulness of the decisions relating to the original seizure and detention of Keyla on June 7, 2011 and continuing to the present day.  These actions have deprived her of her liberty in violation of Constitutional Due Process and traditional Habeas Corpus, 28 U.S.C. §2241.

5.     Jurisdiction to review the agency determinations relating to custody and the May 8, 2013 denial of the Petitioners' application for reunification is also appropriate under the Administrative Procedures Act (APA), 5 U.S.C. § 701 et. seq., and the Immigration and Nationality Act (INA), 8 U.S.C. §1101, et. seq.  The failure to exercise discretion – as opposed to an exercise of discretion that is simply opposed on factual grounds – is "unlawful" within the meaning of the APA §701.  It is also an "abuse of discretion" and "arbitrary and capricious" within the meaning of the APA.  The APA violation provides the jurisdictional basis upon which the Court may make a Declaratory Judgment under 28 U.S.C. §2201.

6.     Jurisdiction is also proper under 28 U.S.C. §1361, under the law of Mandamus. The action requested of the Government, lawful and proper adjudication of the application for reunification and response to requests for information relating to Keyla's health and well-

being, are duties owed to the Petitioners subject to Mandamus. Petitioners' requests for

decision-making that is performed in a manner that actually exercises discretion rather

than applying reasoning to a pre-determined outcome is a "duty owed to the plaintiff."

*See,* 28 U.S.C. §1361. In order for discretion to be a bar to jurisdiction, it must first

actually be exercised. *See, United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260,

266-67, 98 L. Ed. 681, 74 S. Ct. 499 (1954) (*infra*). The Government decisions reflect

predetermination rather than a lawful exercise of discretion.

7.    A court examining the issues of agency discretion over applications for lawful permanent

residence like the one in this case has said:

> If the word 'discretion' means anything in a statutory or
> administrative grant of power, it means that the recipient must
> exercise his authority according to his own understanding and
> conscience.' See *Goncalves v. Reno,* 144 F.3d at 125 (quoting
> *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 266-
> 67, 98 L. Ed. 681, 74 S. Ct. 499 (1954)) (internal quotation marks
> omitted)(alteration in Goncalves) (emphasis added). This comports
> with a doctrine articulated by Judge Jerome Frank in *United States
> ex rel. Adel v. Shaughnessy,* 183 F.2d 371 (2d Cir. 1950), that
> where Congress has granted an agency discretion, courts may
> intervene when there has been 'a clear failure to exercise
> discretion' (as well as when that discretion has been abused). *Id.* at
> 372. In later formulations, courts have said that an agency's 'failure
> to . . . exercise its discretion, when properly called upon to do so, is
> subject to judicial review for arbitrariness and capriciousness.'
> *Wolfe v. Marsh,* 266 U.S. App. D.C. 290, 835 F.2d 354, 358 (D.C.
> Cir. 1987). Here, the Attorney General must actually exercise his
> discretion to determine whether the paroled individuals that
> Congress has deemed eligible for adjustment of status should be
> granted this relief.
> *Succar v. Ashcroft,* 394 F.3d 8, 26 n.23 (1st Cir. 2005).

8.    The APA "embodies the basic presumption of judicial review to one 'suffering legal

wrong because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute.'" *Abbott Laboratories v. Gardner,* 387 U.S. 136,

140 (1967) (quoting 5 U.S.C. § 702)); *see Reno v. Cath. Soc. Servs.*, 509 U.S. 43, 63-64 (1993) ("there is a well-settled presumption favoring interpretation of statutes that allow judicial review of administrative action" (quoting *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 498 (1991)). Thus, courts may only limit access to judicial review where there is "clear and convincing evidence" that Congress intended to restrict review. *Reno*, 509 U.S. at 64; *Abbott Laboratories*, 387 U.S. at 141; *Rusk v. Cort*, 369 U.S. 367, 379-80 (1962).

9.      To the extent that the Government's actions in this matter are not supported by substantial justification, attorney fees are appropriate.  The Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412 (the "EAJA"), provides for the award of costs and attorney's fees to a prevailing party in litigation against the United States or one of its agencies.  The EAJA has been invoked to justify the award of attorney fees and costs in immigration cases.  See, e.g., *Commissioner, Immigration and Naturalization Service v. Jean*, 496 U.S. 154 (1990); accord *Dabone v. Thornburgh*, 734 F.Supp. 195 (E.D. PA 1990) and *Harriott v. Ashcroft*,[1] 277 F. Supp. 2d 538, 545-46 (E.D.Pa. 2003).

### EXHAUSTION

10.     Exhaustion of administrative remedies would be futile in this case.  As a preliminary matter, no remedies exist.  As to custody, the Government and its designees have not provided information as to Keyla's location and have not permitted the Petitioners' any

---

[1] Undersigned counsel was the attorney in *Harriott*.  In that 2003 proceeding, his level of expertise in Immigration Law was recognized and an EAJA judgment based on hourly rate of $300 was approved.  Since that case, Counsel has filed more than 30 Mandamus and Declaratory Judgment actions in federal Court.  He is a frequent speaker on issues such as federal court litigation at the national conference of the American Immigration Lawyers Association (AILA).

access to her.  These actions have been taken without issuance of a formal opinion or decision.  Upon information and belief, any request for information has been referred to the Freedom of Information Act ( FOIA) process and as of this date is still pending with ORR while the FOIA process is on appeal with Immigration and Customs Enforcement.

11.   Second, as to the application for reunification, the communication of the denial decision on May 8, 2013 was made through email with no reasoning.  A request for additional explanation for reasoning or review was refused citing alleged confidentiality.  Upon information and belief the May 8, 2013 denial was the result of a predetermined position established on or before November 2011 when the ORR first informed the Petitioners they had no legal standing with respect to Keyla.

12.   In more recent actions, the Government and its designees have taken secretive actions even while purporting to be in communication with counsel for the Petitioner.  The most recent filing by the Government and its designees in the Immigration Court matter for Keyla was an assertion that the Petitioners lack any standing to intervene in any legal matter relating to Keyla.  The lack of good faith in any communication on this matter, coupled with the fact that no administrative remedy exists are sufficient to show that exhaustion is impossible and would be futile even if it existed.

## STATEMENT OF THE CLAIM

13.   Keyla was born August 22, 1999 in Matamoros, Mexico.  Her mother, Nereyda Concepcion Ruiz Guajardo was just 12 years old at the time of Keyla's birth.  Exhibit 1

(Birth Certificate of minor child Keyla Eulalia Ruiz Guajardo)[2].  Keyla is the child of a gang rape of Nereyda and her father is unknown.  From the time of her birth, Keyla was cared for by her maternal great-grandmother, Maria Antonia Guajardo Corpus (Antonia).  Keyla's grandmother had died giving birth to Nereyda, thus, Antonia was the closest relative able to care for Keyla.  Keyla is a special needs child diagnosed with partial and complex partial epilepsy, cerebral palsy, static encephalopathy, pseudo-bulbar palsy, and microcephaly.  Exhibit 2 (Medical Reports).[3]

14. On March 8, 2001, Antonia and Keyla met the Petitioners in Matamoros, Mexico.  Antonia asked that they help with Keyla's medicines for her seizures.  From 2001 through August 2005, the Petitioners provided that assistance for Keyla and helped Antonia as well.  At that time, Antonia and Keyla both moved in to Casa Bugambilia, a refuge home owned by the Petitioners in which they provide assistance to people in need in Matamoros, especially those who have been abandoned or are in need of health care.  Antonia and Keyla lived with the Petitioners in August 2005.  In January 2006, Antonia died of an infection.  In December 2005, before she died, she again requested the Petitioners to care for Keyla.  From that day forward, the Petitioners have treated and considered Keyla as a daughter.

15. For five and a half years, from January 2006 through June 2011, Keyla lived with the Petitioners as part of their family.  They provided medical care for her.  No other family

---

[2] The birth record incorrectly sets Nereyda's age as 13 at the time of Keyla's birth. This was likely due to confusion about her birth date – December 1, 1986 (not January 12, 1986).
[3] The Petitioners communicated a willingness from the outset of this matter on June 7, 2011 to share documentation relating to Keyla's medical diagnoses and treatment history with the U.S. government. That offer was re-stated most recently just over one month ago. To date the Respondents have neither accepted the offer to review this information nor have they shared subsequent information about Keyla's care since she was seized, except to provide an occasional informal comment in telephone conversations and emails.

member was able or willing to care for Keyla, although she did have an aunt, Adriana Beatriz Ruiz Guajardo, as well as cousins who maintained contact. However, as Adriana has explained, the Coxes have provided the best home for her and she has relinquished any claim to custody. Exhibit 3 (statement of Adriana Beatriz Ruiz Guajardo September 25, 2013); see also, Exhibit 17 Tab 1 (Affidavit of Adriana Beatriz Ruiz Guajardo February 13, 2012).

16.     During the first half of 2011, conditions deteriorated in Matamoros. The Casa Bugambilia refuge became a focus point for one group in a dispute amongst drug cartels, because of its location in Matamoros. One of these groups, Los Zetas, were and are trying to take Matamoros away from the control of the other, the Gulf Cartel. The Petitioners began to receive direct threats in May of 2011 which they believed were from this rival of the Gulf Cartel. The threats included in-person visits from masked individuals asking workers at the house to describe who lived and slept there. The Petitioners took these threats as credible because Matamoros was going through a wave of violence that eventually led to the death of a Zeta leader. This killing occurred about ten days after Mr. Cox left Mexico with Keyla.

17.     From May 28, 2011 through June 7, 2011 the Petitioners fled to the U.S. for their own safety. For these ten days, Keyla was placed for her safety away from Casa Bugambilia, first with her great aunt, Adriana, and then with Dr. Rodriguez Cox's family. During this time, they attempted to find a way to have Keyla cross legally into the U.S.. They attempted to arrange safe passage through the offices of Congresswoman Kay Granger and U.S. consular officials at the Department of State. The other family members did not want to care for Keyla. The pressure of not having anyone responsible in Matamoros to

care for Keyla and the Petitioners' concerns for her health led to the Petitioners following the advice of Congresswoman Kay Granger and the State Department to cross the border on June 7, 2011with Keyla and ask for humanitarian parole from Customs and Border Protection (CBP). Mr. Cox had undertaken similar border crossings with the support of the Congresswoman for children in need of medical care. Exhibit 4 (October 7, 2010 letter of Congresswoman Kay Granger). He undertook this border crossing with the full knowledge and cooperation of the Congressional and consular offices. He personally discussed the matter with a Department of Homeland Security (DHS) representative, Katherine Brown, and received a verbal affirmation that he would be permitted to travel from the Congresswoman's office.

18.     On June 7, 2011, Petitioner - Mr. Cox traveled with Keyla across the border from Matamoros to Brownsville, intending to request humanitarian parole. That day, Mr. Cox was met on the Mexican side of the border by U.S. consular official, Jason Monks, who had been charged with transporting Keyla, and Alma Idalia Rodriguez, Dr. Rodriguez Cox's sister, who is the source of the claim of abuse against Keyla in this matter. Neither of the Petitioners saw Keyla between May 28, 2011 and the attempt to enter on June 7, 2011.

19.     At the time of the application for entry to the U.S., Mr. Cox had the permission of Keyla's closest relative, her aunt Adriana, since the Petitioners had been caring for Keyla for more than 5 years and provided her the best opportunities to escape the poverty and violence in Matamoros. This permission had not been granted in written form due to the emergency nature of the travel, but it has since been confirmed on multiple occasions. *Supra*. Upon inspection, agents of DHS CBP took custody of Keyla. The request for

humanitarian parole was summarily denied.  No written decision was issued.  Neither of the Petitioners has seen Keyla since that day more than three and a half years ago.  The Government has not provided information about her whereabouts nor has it provided them with access to her.

20.     On information and belief, the Government seizure was based on allegations of sexual abuse made against Mr. Cox by Dr. Rodriguez Cox's sister, Alma Idalia Rodriguez. Those allegations have been investigated and, upon information and belief, they have been recanted and proven to be unfounded.

21.     Upon seizing Keyla, the Government designated her as an "Unaccompanied Minor (UAC)."  Under that designation, Keyla's custody and care was turned over to the Office of Refugee Resettlement (ORR) a component agency of the Department of Health and Human Services (HHS).  ORR quickly transferred Keyla to Chicago and eventually to the Philadelphia area, where she remains today in the custody of ORR contractor and designate, Lutheran Children and Family Services (LCFS).

22.     The Coxes attempted communication to ascertain Keyla's whereabouts and well-being immediately.  They were informed by ORR that Keyla would be placed with her maternal grandfather, Sergio Ruiz Guajardo, who is undocumented and living in North Carolina. Sergio had never had anything to do with Keyla in her life.  He soon agreed to relinquish his custody and care rights on July 10, 2011.  Exhibit 5 (July 10, 2011 declaration as to Child Custody by Sergio Ruiz Guajardo).  The Petitioners established and have maintained communication with Sergio and would have supported a placement of Keyla with him.  If that placement had occurred, they were prepared to provide Sergio with financial and medical support.

23.    At some point between July and October 2011, the Government decided not to place Keyla with her grandfather.  He subsequently reaffirmed his statement to relinquish Keyla to the Petitioners on November 8, 2011, when the Petitioners filed for conservatorship in Texas.  Exhibit 6 (Affidavit of Sergio Ruiz Guajardo November 8, 2011).

24.    It is unknown what the federal Government has done to investigate the allegations against the Petitioners.  However, beginning soon after Keyla's entry, the Texas Department of Child Protective Services (Texas CPS) began an investigation.  As part of the Petitioners' request for conservatorship, the Texas CPS provided a redacted version of its investigative records and then an unredacted version of additional records.  Exhibit 7 (April 20, 2012 Redacted Texas CPS records) and Exhibit 8 (April 25, 2012 Un-redacted Texas CPS records).  The Texas CPS investigation included a review of the Petitioners' relationship, in particular Mr. Cox's relationship, with two other children the Petitioners had in their care, Jesse and Nancy Roblero Palomino.  The Texas CPS investigation began on June 17, 2011, ten days after the attempt to cross the border by Mr. Cox and Keyla.  As early as September 14, 2011, any abuse with respect to these two other children had been ruled out by Texas CPS.  Exhibit 7 (Sept. 14, 2011 CPS Notice of Findings).  A narrative of the Texas CPS investigation shows that the agency interviewed the individual making the allegation, Dr. Rodriguez Cox's sister, Alma Idalia; the doctor who called the original allegation in, Dr. Guillermo Torres; both of the Petitioners; the two children in the home, Jesse and Nancy; "Vicky" who worked with the Petitioners and Keyla at Casa Bugambilia; and a consular official, Anahi Velasquez, who was present

when Keyla was interviewed by U.S. government investigator, Patricia Barquet, shortly after Keyla's detention. Id (notes from June 18, 2011 through September 14, 2011).

25.    None of the witnesses interviewed by Texas CPS credibly confirmed abuse.  The accuser Alma Idalia, made additional allegations against her sister relating to physical abuse against the other girl in the home, Nancy Roblero Palomino, that proved to be unfounded. Her allegations with respect to Keyla were not supported and, upon information and belief, she has since recanted.  During the Texas CPS investigation the doctor who called in the allegation, Guillermo Torres, indicated his only information was second hand and had come from the accuser, who he was simply trying to support.  The consular official also indicated that in her observation of the U.S. Government's June 7, 2011 questioning of Keyla that she did not make any outcry or accusation of abuse. Id.  Finally, the Texas CPS investigation included a July 29, 2011 interview with a pastor from Matamoros who indicated that Mr. Cox had only done good things there and the pastor did not believe that Mr. Cox had ever done anything improper with the children in his care.

26.    A second Texas CPS investigation was conducted in December 2011 after an apparent outcry against the Petitioners by Keyla.  The fact of this alleged outcry was never told to the Petitioners directly.  Rather they were informed of it informally in their later communications with ORR and ICE officials in 2013.  At the time of the alleged December 2011 outcry, no abuse was found.

27.    The Government did inform the Petitioners that Keyla was taken from Texas to Chicago, Illinois.  They provided the contact information of Keyla's government appointed attorney, Alexandra Fung, of the Immigration Children Protection Project of the National Immigration Justice Center.  Between July 7, 2011 and July 15, the Petitioners and Ms.

Fung exchanged information about Keyla via email.  Exhibit 9 (email chain dated July 7,

2011 – July 15, 2011).  Ms. Fung provided Mr. Cox with the contact information of Carol

Rech as the ORR contact.  After Ms. Fung told Mr. Cox that Keyla had had seizures, he

contacted Ms. Rech via email on July 13, 2011 to offer further information about her

medications and treatment plans.  Exhibit 10 (July 13, 2011- July 20, 2011 email chain

between Mr. Cox, Carol Rech and Mary Meg McCarthy).  Since Ms. Rech was the

apparent representative of the Government with respect to Keyla's custody, Mr. Cox also

stated in his email to her that, "We also want to petition in the manner directed by your

office to become Keyla's legal guardians/adoptive parents."  Mr. Cox provided the family

history as recorded above.  Ms. Rech referred him to other individuals, including Ms.

Fung, ORR officer, James de la Cruz,  and eventually to Maureen Dunn, ORR supervisor

in Washington, DC.  At the time these communications were made, Keyla's grandfather,

Sergio, had already relinquished custody rights to the Petitioners, since he had no contact

with Keyla and the Petitioners had been caring for Keyla for much of her life.  Exhibit 5.

The Petitioners never received instructions on their requests for the proper procedures on

filing a family reunification request with ORR.  The July 13, 2011 email was a clear

written request.

28.     Even though Sergio had left custody to the Petitioners, on September 7, 2011 the ORR

sent a request to Sergio directing him to apply for reunification with Keyla.  Exhibit 11

(September 7, 2011 fax).  ORR pursued this potential placement, despite the fact that

Sergio was undocumented himself, had little or no previous contact with Keyla, and did

not have the means to provide for her care.

29.     On October 28, 2011, after not receiving any instructions or communications regarding

their requests to ORR to be Keyla's guardians, the Petitioners initiated proceedings for

conservatorship in Texas.  Exhibit 12 (Order of October 28, 2011 appointing Dr. Nancy

Rodriguez Cox temporary Conservator).  The Petitioners' family law attorney contacted

ORR regarding the Texas proceeding.  After the issuance of the order, the Petitioners

again tried to contact the Government.  On October 31, 2011, through counsel, they

contacted ORR officer James de la Cruz via telephone and email.  Their requests

included: "What steps can we take on behalf of Keyla with the ultimate goal of having

physical as well as legal custody and obtaining legal status for her in the United States?"

Exhibit 13 (October 31. 2011 email from attorney Kay Martinez to ORR officer de la

Cruz).

30.     These requests were referred to Mr. de la Cruz's supervisor, Maureen Dunn.  On

November 2, 2011 Ms. Dunn's entire response to Ms. Martinez's detailed requests and

information was as follows:

> You and the Coxes have no biological or legal relationship to
> Keyla.  I cannot provide any information since Keyla is a minor
> with no parents to speak on her behalf.  You can find out about our
> services to unaccompanied alien children on our website and on
> the internet so you can be reassured Keyla is well taken care of.
> **Our legal office will contact you** after reviewing the attachment.
> Exhibit 14 (November 2, 2011 email from Maureen Dunn to
> Attorney Martinez) (emphasis added)

No substantive communication was ever received from the ORR legal office as asserted

in Ms. Dunn's email.  Ms. Dunn does not provide any instruction other than the vague

reference to review the website. *See*, footnote 4, *infra*.  Upon information and belief, the

ORR decision to hold and not relinquish custody over Keyla was already made at the

time this email was written.  The Government has never provided a direct legal reason for

its actions nor has it substantively responded to the Petitioners' requests, including the request for cooperation and information on the procedures for lawfully obtaining guardianship and custody of Keyla.

31.    On November 14, 2011, the Petitioners, through counsel, provided the various Government defendants with official service and notice of the Texas Court Conservatorship filing. Exhibit 15 (November 14, 2011 notice of Texas Court filing). After continuing informal attempts at communication via telephone over the next several months, the Petitioners finally decided to proceed in Texas Court. On March 29, 2012, they filed a request for a hearing and included a full package of supporting documents. Exhibit 16 (March 29, 2012 Motion and Order to Set a on the Non-Jury Docket). The filing included affirmations from Keyla's only known relatives, her aunt Adriana and her grandfather Sergio, supporting the Petitioners' request. It also included confirmation of her mother's disappearance and her great-grandmother's death as well confirmation of information relating to the care of the other children already in the Coxes care. Exhibit 17 (Package of evidence tabs 1-12).

32.    After receiving the service of the Petitioners' motion in Texas Court, on April 13, 2012 attorney Alexandra Fung, who had communicated with the Petitioners in the summer of 2011, submitted a letter indicating that she was no longer Keyla's attorney and that Keyla had been transferred out of Chicago ORR jurisdiction. Exhibit 18 (April 13, 2012 letter of attorney Fung). This letter provided no further information about Keyla or about her new attorney.

33.    On April 13, 2012, the Texas Court granted full conservatorship regarding Keyla to the Petitioners. Exhibit 19 (April 13, 2012 Order of Texas District Court grating

conservatorship). In addition to providing full service and notice to all government parties, the Petitioners specifically addressed all allegations of abuse in open court. Exhibit 20 (Transcript of April 13, 2012 Hearing).

34.     Less than one month after obtaining the Order from Texas District Court, the Petitioners filed a reunification application with the Defendants ORR. Exhibit 21 (May 11, 2012 Family Reunification Application form ORR UAC/FRP-3 with attachments). As before, the Petitioners provided all relevant information, including information from Keyla's known relatives indicating support for the application and information on the other children in their home and the results of the Texas CPS investigation.

35.     From records that were only recently submitted in Keyla's Immigration Court removal case, it appears that rather than address the Petitioners' request for reunification in good faith, the Defendants made a decision to undertake their own family court action purportedly on her behalf. On May 11, 2012 the ORR, through Maureen Dunn, appointed counsel from Defendant Philadelphia Hebrew Immigrant Aid Society (HIAS) and Defendant Philadelphia Support Center for Child Advocates to represent Keyla. Exhibit 29, tab E (May 11, 2012 letter of Maureen Dunn). The ORR through Ms. Dunn issued a reassignment of the Child Advocate and specifically noted the "Concerns about adults seeking to sponsor child" as a factor making Keyla vulnerable. Id. Ms. Dunn's letter contained a patently incorrect assertion that "Larry Cox did not request specific consent from HHS prior to initiating conservatorship proceedings in the Texas state court." Compare, Exhibit 10 (email requests for proper procedures to be appointed

18

guardian).[4]  Upon information and belief, ORR provided instructions to the Pennsylvania

attorneys to pursue a Pennsylvania family court proceeding to declare Keyla dependent

on the state and never intended to act in good faith on the already-pending reunification

request submitted by the Petitioners.  Unlike a more formal request for adoption,

guardianship or conservatorship a dependency request does not require ORR consent.  A

dependency order leaves the question of proper custody and guardianship undetermined.

It is unknown whether the Defendants have undertaken steps to initiate guardianship or

other legal changes to custody in Pennsylvania.  If it has done so, then it has obviously

provided someone else with the legal consent it refused the Petitioners (despite the fact

that the Petitioners raised Keyla in their own home for six years and provided care and

assistance to her for most of her life.)  The May 11, 2012 letter is indicative of an agency

that had already made up its mind based on allegations that it already knew to be false.

36.    Despite the actions it was taking internally, the ORR continued to lead the Coxes to

believe their application would be addressed in good faith.  It took no substantive action

on the application until after being requested on September 20, 2012 to take action.

Exhibit 22 (September 20, 2012 letter of counsel to Ms. Dunn).  Counsel's letter

indicated the Coxes lack of understanding of a specific consent requirement, but made

that request specifically and in writing in the September 20, 2012 letter.  The letter also

made requests for information which have never been responded to at this time.  In

---

[4]  The ORR website includes a form (ORR-C1) for specific consent for juvenile court
jurisdiction.  The ORR-C-1 is not required by either regulation or statute.  It is not the exclusive
means for making a specific consent request.  Public access to the form is provided, not in the
ORR Family Reunification portion of the website, but in its Unaccompanied Minor instructions.
http://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services.

January 2013, ORR officer de la Cruz contacted the Petitioners and they referred him to speak with their attorney. Exhibit 23 (letter of Mr. Cox to Mr. de la Cruz).

37.     As part of its review process, the ORR requested ICE to investigate and speak with the Petitioners. On February 10, 2013, the Petitioners each spoke individually with ICE officer, Joseph Baker, in an investigatory interview conducted ostensibly for the purposes of their family reunification application. Exhibit 24 (February 7, 2013 email from Mr. Baker confirming scope of the interview).

38.     Similarly, Mr. de la Cruz spoke briefly with the Petitioners at the Harlingen Airport on April 10, 2013. At this brief meeting, Mr. de la Cruz informed the Petitioner that the reunification application was moving forward and would likely be approved subject to a home study and other transitional issues. The implication was that Keyla would be released to the Petitioners. The Texas CPS had already conducted home studies as part of the conservatorship process.

39.     After Mr. de la Cruz's interview, the next step was to be a home study to which the Petitioners consented. Instead, on May 8, 2013 Mr. de la Cruz sent an email stating, without reasoning that, "ORR has made the decision that it is not in Keyla's best interest that she be released to you." Exhibit 25 (May 8, 2013 email from James de la Cruz). The email indicated that further requests for information should be sent to Tricia Swartz, ORR Associate Deputy Director. Through counsel, the Petitioners made a formal request for reasoning and information relating to the decision. Exhibit 26 (May 8, 2013 letter of attorney Kathleen Walker to Ms. Swartz). Ms Swartz replied with an email indicating that, "We are not able to release children's specific case information." Exhibit 27 (May 10, 2013 email chain between Ms. Walker and Ms. Swartz).

40.     From that date to this, ORR has not provided any communication to the Petitioners on
        any matter.

41.     In the course of the application for family reunification, the Petitioners became aware of
        Keyla's Alien Registration #201-296-187, because it was on a form they were required to
        sign. With that number, they were eventually able to ascertain that Keyla had been
        placed in Immigration Court removal proceedings in Philadelphia. It was determined that
        a hearing was scheduled on February 10, 2014.

42.     Through undersigned counsel, contact was made with Keyla's current ORR-assigned
        counsel from Philadelphia HIAS on or about February 4, 2014. In the telephone
        conversation, undersigned counsel became aware that Pennsylvania ORR-assigned
        counsel had obtained a family court order in Pennsylvania concerning Keyla. It is the
        position of Keyla's ORR-appointed advocates that no information about the Pennsylvania
        proceedings needs to be shared with the Petitioners or the Texas court since ORR
        considered the Texas order invalid. At the conclusion of that conversation ORR-assigned
        counsel filed a Motion to Terminate removal proceedings with the Immigration Court
        regarding Keyla, and the order was granted expeditiously. No notice or communication
        was provided to the Petitioners or to undersigned Counsel of this Motion to Terminate by
        ORR-assigned counsel of any of their activity in Immigration Court or with the U.S.
        Citizenship and Immigration Services regarding Keyla. The result was the cancellation
        of the February 10, 2014 hearing by order of the Court.

43.     Undersigned counsel filed a Motion to Rescind the termination order and a Motion to
        permit the Petitioners to appear *in loco parentis* for Keyla. Exhibit 28 (February 10,
        2014 Motions). On February 14, 2014, undersigned counsel made a request to ORR-

appointed counsel in the Pennsylvania family court proceedings for a controlled visitation by Dr. Nancy Rodriguez Cox and information about those proceedings and Keyla's well being and care.  That request was declined and no further communication has been received.

44.     On February 25, 2014 ORR-assigned counsel provided a response to the Petitioners' Motions in Immigration Court.  That response indicated for the first time that the ostensible reason the Petitioners were not recognized and approved for family reunification in 2013 was that they had failed to formally request ORR consent for their Texas court proceedings.  Exhibit 29 (February 29, 2014 Response in Immigration Court).  The Response does not mention any abuse allegations – it only cites the alleged failure to follow an ORR procedure.  As part of the response, ORR-assigned counsel for Keyla utilized a form I-213 from Government defendant ICE in support of its position. That form indicated the original allegation of sexual abuse, but in no other part of the response was that allegation re-asserted or alleged.

45.     The response also included a February 21, 2014 letter from the ORR-appointed Child Advocates for Keyla from the Young Center for Immigrant Children's Rights in Chicago. Exhibit 29.  That letter does not provide any basis or background – such as in-person observation or other clinical assessment – to support the ultimate assessment that it is in Keyla's best interest to have her immigration status resolved quickly.  Interestingly, the letter does not state that it is in Keyla's best interest to remain in ORR custody and even contemplates non-ORR custody.  It is unclear why an office in Chicago is Keyla's designated Child Advocate given her location in Philadelphia and the apparent

appointment of a Child Advocate in Philadelphia. *See*, Exhibit 29 (letters of ORR and the Young Center for Immigrant Children's Rights).

46.     The Motion for Petitioners to intervene *in loco parentis* in the Immigration Court removal proceedings remains pending.  The Defendants have not shared any information about  Keyla with the Petitioners or counsel.

47.     The ORR assertion made in Ms. Dunn's May 11, 2012 letter (Exhibit 29, tab E) that the Petitioners did not ask for specific consent is belied by the Petitioners July 13, 2011 emails (Exhibit 10) and their counsel's letter of September 20, 2012 (Exhibit 22).

48.     The Defendants seizure and detention of the minor child Keyla Eulalia Ruiz Guajardo is unlawful.

49.     She has already spent almost three years separated from the only family she has ever known.  Her liberty interest far outweighs any governmental interest in detaining her while an administrative process goes forward that the Government itself can control. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm and detention prior to trial is the carefully limited exception").

50.     The fundamental right to be free from physical restraint applies to non-citizens as well as citizens. *See, e.g., Wong Wing v. U.S.*, 163 U.S. 228, 238 (1896). This fundamental right is implicated by immigration detention pending deportation or removal proceedings. *See Doherty v. Thornburgh*, 943 F.2d 204, 209 (2nd Cir. 1991) (even undocumented aliens have "substantive due process rights to be free from arbitrary confinement pending

deportation proceedings"), *cert. dismissed sub. nom. Doherty v. Barr*, 503 U.S. 901 (1992); *Foucha v. U.S.*, *supra* at 80 (1992) ("**Commitment for any purpose** constitutes a significant deprivation of liberty that requires due process protection.")(emphasis added); *Zadvydas v. Davis, supra; Harisiades v. Shaughnessy*, 342 U.S. 580, 586 and n.9 (1952) (immigrants stand on "equal footing with citizens" under the Constitution in several respects, including the protection of personal liberty).

51.   The Third Circuit has held that Government detention of individuals is unlawful in cases that failed to follow applicable regulations. *Ngo v. INS*, 192 F.3d 390 (3rd Cir. 1999). In this case the CBP, ICE, and ORR have all violated applicable regulations and Keyla's 5th Amendment Due Process rights.

## THE STATUTORY AND REGULATORY SCHEME TO PROTECT UNACCOMPANIED MINORS

52.   The Government has classified Keyla as an Unaccompanied Alien Child (UAC) pursuant to 6 U.S.C. §279(g). That section is as follows:

> **(g) Definitions**
> As used in this section—
> **(1)** the term "placement" means the placement of an unaccompanied alien child in either a detention facility or an alternative to such a facility; and
> **(2)** the term "unaccompanied alien child" means a child who—
> **(A)** has no lawful immigration status in the United States;
> **(B)** has not attained 18 years of age; and
> **(C)** with respect to whom—
>     **(i)** there is no parent or legal guardian in the United States;
> or
>     **(ii)** no parent or legal guardian in the United States is available to provide care and physical custody.

53.   According to the Defendants, the UAC designation is made at the time of entry by either CBP or ICE. Exhibit 29 (filing by ORR-appointed counsel). Under the UAC

designation, the Defendant HHS assumed custody over Keyla pursuant to 8 U.S.C.

§1232(b) after determining that she did not have the faculties/ability to make an

independent decision to return to Mexico.  8 U.S.C. §1232(a)(2)(A)(iii).  It does not

appear that the Government designated Keyla as a victim of trafficking under 8 U.S.C.

§1232(a)(2)(A)(i).

54.   Under the empowering statutes, any action, like the one the Petitioners filed for Keyla in

Texas, requires consent of the Secretary of HHS.  8 U.S.C. §101(a)(27)(J)(iii)(I).  As

stated above, the Petitioners made such a request and have never received a formal

response.  To the degree that the Government's lack of response could be construed to be

an answer, it should be construed to be a denial without reasoning.

55.   Under the statute the Government is required to ensure safe placement.  8 U.S.C. 1232(c):

> **(c) Providing safe and secure placements for children**
> **(1) Policies and programs** The Secretary of Health and Human Services, Secretary
> of Homeland Security, Attorney General, and Secretary of State shall establish
> policies and programs to ensure that unaccompanied alien children in the United
> States are protected from traffickers and other persons seeking to victimize or
> otherwise engage such children in criminal, harmful, or exploitative activity,
> including policies and programs reflecting best practices in witness security
> programs.

This statute establishes the basic duty of care that ORR assumed when it seized Keyla

from the Petitioners' custody and care.  It has not exercised that duty appropriately, given

that it is has refused contact with the only family that Keyla knows without good cause

for doing so.  It has declined important information that would have optimized the

medical care for Keyla.  The refusal to share information potentially led to Keyla having

a seizure(s) in ORR custody.  The lack of access and information makes it unclear what

other actions or inactions of the ORR have affected Keyla's emotional and physical well-

being in the almost three years, since she was seized.

56.     At no point in time have any of the Defendants asserted or shown that they are motivated
        by Keyla's best interest.  The one letter in the record discussing Keyla's best interest is
        from a child advocacy center in Chicago and even that letter does not assert or claim it is
        in her best interest to remain in ORR custody.  From the very first minute of Keyla's
        detention, the Government refused good faith information about her medical conditions,
        medications and treatment.  Upon information and belief, this lack of care and treatment
        led to her having a seizure(s) during her ORR custody.  To this date, the Government has
        declined to accept Keyla's medical history information that was offered by the
        Petitioners.  We respectfully assert that these are not the actions of an agency with the
        best interests of a vulnerable child in mind.  Rather they are the actions of an Agency that
        does not want to have its decisions questioned.

57.     Upon information and belief, the Government knew early in this process – by the
        conclusion of the Texas CPS investigation in September 2011 – that the allegations of
        abuse against the Petitioners were false.  The Government also knew that all of Keyla's
        living relatives had recognized the relationship between her and the Petitioners and had
        ceded custodial rights to them.  They also knew of Petitioners' desire and ability to
        continue the care relationship with Keyla that stretched back almost her whole life.
        Finally, the Government knew that the Petitioners desired to assume lawful custody
        through appropriate and proper procedures.  All of these facts were in existence on or
        before September 2011.

58.     Despite all the pre-requisites being met, the ORR decision to continue custody was made
        by Ms. Dunn in November 2011, for reasons unknown.  The Government has not
        deviated from that decision even though it was incorrectly made.  The decision to

proceed with a family court action to declare dependency in Pennsylvania was done in secret, without notice to the Petitioners or to the Texas Court that issued the April 2012 Order. Upon information and belief, it was also filed without notice to Mexican authorities or consular officials. The Defendants and their designees in Pennsylvania took all of these actions based on the result that was dictated by the ORR decisions against the Petitioners and not what was in Keyla's best interest.

59.     The existence of all of these factual conditions are sufficient to show that Keyla is no longer properly classified as an AUC (if she was ever properly classified) and that the Petitioners were proper sponsors under the applicable Agency rules. *See*, Stipulated Settlement Agreement of *Flore v. Reno*, case cv-85-4544 (C.D.Ca.). The Petitioners' willingness and ability to properly serve as her guardians was and remains sufficient to take Keyla out of UAC classification under §279(g)(2)(c)(ii). The actions of the Government to thwart the Petitioners' good faith efforts to obtain legal custody in Texas, its refusal to recognize the Texas Court order, and its actions to obtain at least one secret order from the Commonwealth of Pennsylvania are indicative of an Agency which has established a predetermined outcome and then fit the circumstances to prove it.

60.     The lack of a good-faith from the outset also causes a concern that the Government is not actually acting in Keyla's best interest. It may be that the Agency believes it was acting upon allegations of abuse – but the known allegations of abuse were disproven more than two and half years ago. The Agency cannot continue to hold a child against the wishes of her relatives and in opposition to a valid state Court order in a case where it has violated its own statute and regulations.

61.     In the end, this Petition and Complaint are about a search for the truth.  The Petitioners

are prepared to share their piece of the truth of Keyla's life and experiences.  They would

like to continue to do so with Keyla in their lives and she in theirs.  It is time for the

Government to stop hiding Keyla and bring its piece of truth to the table as well.


### COUNT I – DECLARATORY JUDGMENT

62.     The introduction and paragraphs 1- 61 above are herby incorporated as if set forth herein

in their entirety.  The agency violations of law provide the jurisdictional basis upon

which the Court may make a Declaratory Judgment under 28 U.S.C. §2201.  The failure

and/or refusal to exercise discretion are a violation of the APA and the duty to administer

the law and adjudicate in the INA.  8 U.S.C. §1101, 1103(a).  The APA, 5 U.S.C. §706(1)

allows a Court to "compel agency action unlawfully withheld."  The APA, 5 U.S.C.

§706(2) allows a Court to:

> hold unlawful and set aside agency action, findings, and
> conclusions found to be – (A) arbitrary, capricious, an abuse of
> discretion, or otherwise not in accordance with law; (B) contrary to
> constitutional right, power, privilege, or immunity; (C) in excess
> of statutory jurisdiction, authority, or limitations, or short of
> statutory right; [or] (D) without observance of procedure required
> by law.

The agency actions are an unlawful withholding of a decision (APA §706(1)); an abuse

of discretion (APA §706(2)(A)); are contrary to Constitutional Due Process (APA

§706(2)(B)); in excess of statutory powers (APA §706(2)(C)); and a failure to observe

agency procedures embodied in regulations and memorandum (APA §706(2)(D)).

63.    The applicable laws that have been violated are:

    a.    an incorrect classification of Keyla as UAC under 6 U.S.C. §279(g)(2);

    b.    a failure to provide a safe and secure placement under 8 U.S.C. §1232(c);

    c.    duty to exercise discretion, *see Accardi, supra*

    d.    duty to act in good faith in providing or declining consent to family court jurisdiction under 8 U.S.C. §1101(a)(27)(J)

    e.    duty to make a reasoned and unbiased decision on the Petitioners' request for reunification under 28 U.S.C. §1361 (Mandamus);

    f.    duty to release an unaccompanied alien child to a qualified sponsor without unnecessary delay under the Stipulated Settlement Agreement of *Flores v. Reno*, case cv-85-4544 (C.D.Ca.) (found at ORR website at: http://ebookbrowsee.net/flores-v-reno-settlement-agreement-pdf-d180710652

    g.    interference with the Petitioners' duties to provide care for Keyla pursuant to the Texas Court Order and with Keyla's interests to have a cohesive and integral family pursuant to applicable international,[5] federal and state law.

---

[5] The international norms reflect U.S. domestic law in many ways. The Convention on the Rights of the Child (CRC) Article 3 states that "in all actions concerning children, whether undertaken by private or public social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration." GA res. 44/25, annex, 44 UN GAOR Supp. (No. 49) at 167, UN Doc. A/44/49 (1989). Article 7 provides children with, "as far as possible, the right to know and be cared for by his or her parents." In its preamble the Convention declares that "the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance.... The child ... should grow up in a family environment." Id. The Coxes are the closest thing to a family that Keyla have. Their motivations to care for her come from their commitment to her great-grandmother and their efforts in this matter are supported by her blood relatives because they are in the best position to provide a loving and caring home for Keyla.

64.   The proper remedy is a declaratory judgment by this Court stating that the Government actions and inactions denials are unlawful and ordering the immediate consent to juvenile court jurisdiction to Texas and the release of Keyla to the Petitioners' custody in accordance with the Texas Court order.

## COUNT II – HABEAS

65.   The introduction and paragraphs 1- 64 above are herby incorporated as if set forth herein in their entirety.

66.   Petitioner's continued custody is arbitrary and capricious, contrary to the provisions of the Fifth Amendment to the Constitution and the law of habeas, U.S. Const. Art. I, sec. 9 and 28 U.S.C. §2241.

67.   Keyla's detention denies her a place with her rightful family.  The Petitioners have been authorized to assume custody and care over Keyla by her only known family members. They are able and willing to do so.  The complete restriction on contact or communication is deleterious to the emotional and medical health of this young girl.

WHEREFORE, Petitioners prays that this Court grant a hearing, and on cause shown, grant the following relief:

a.   Vacate and reverse Government decisions denying reunification between Keyla and the Petitioners;

b.   Order the Government to cease any actions in Pennsylvania Court, and/or to move to vacate such actions that have already been undertaken or completed;

c.   Order the Government to consent to juvenile court jurisdiction in Texas and abide by the Texas Court order for conservatorship;

    d.       Order Keyla's release from Government custody, to the Petitioners' custody, and

    e.       Such other relief as the Court may order, including attorneys fees and costs

Respectfully submitted,

/s/Joseph C. Hohenstein
PA ID # 69226
ORLOW, KAPLAN & HOHENSTEIN
PO Box 40017
620 Chestnut Street - Suite 656
Philadelphia, PA 19106
215-922-1183

March 25, 2014